UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TYCO HEALTHCARE GROUP LP<br><br>Plaintiff,<br><br>v.<br><br>MEDICAL PRODUCTS, INC.<br><br>Defendant. | Civil Action No. 1:04-cv-11524-DPW |

## AFFIDAVIT OF EDDIE MCCAFFERTY

I, Eddie McCafferty, being duly sworn, hereby state:

1. I am the President and sole-owner of Medical Products, Inc. ("MPI"), the defendant in the above-captioned case. Except where otherwise indicated, I make the following statements on the basis of my personal knowledge.

2. I founded MPI in 1984. Since then, MPI has operated in the highly competitive field of medical product distribution, purchasing products from other medical products distributors, wholesalers or manufacturers and re-selling those products at slightly marked-up prices to other medical products distributors.

3. Most of MPI's customers are small providers of medical services, such as small distributors, who typically do not purchase medical products in large enough volume to warrant purchasing directly from manufacturers at competitive prices.

4. MPI employs less than ten people, each of whom work out of a single office located in Ripley, Mississippi. In 2003, MPI had gross sales of less than $10.4 million and net income of less than $158,000.

5. MPI has no real or personal property holdings, mailing addresses or telephone listings or bank accounts in Massachusetts.

6. MPI's customers could easily purchase the same products elsewhere. MPI competes based on price, service and the relationship it has cultivated with its customers. To protect its business, MPI keeps information about its customers confidential and generally does not share their identity or purchasing information with manufacturers or distributors.

7. MPI has distributed the Plaintiff's needles and syringes since shortly after MPI opened for business. For approximately 15 years, MPI did so with products purchased from other medical products distributors or wholesalers.

8. The only reason MPI changed that system of indirect purchasing was that David Gaffney, a sales representative for the Plaintiff who worked out of Jackson, Mississippi, came to MPI's Ripley, Mississippi office and met with me. At that meeting, Mr. Gaffney offered to sell the Plaintiff's products directly to MPI. To handle MPI's account, Mr. Gaffney assigned Rob Cotton, another sales representative who worked out of Memphis, Tennessee and regularly visited MPI's Ripley, Mississippi office.

9. In late 2000 or early 2001, Mr. Cotton met with me and other MPI personnel in Ripley, Mississippi and explained the direct purchasing arrangement. Mr. Cotton indicated that he was aware that MPI had been purchasing the Plaintiff's products from other distributors and wholesalers and selling them to various customers. Under the direct purchasing arrangement, Mr. Cotton said that MPI could continue to sell to all of its existing customers.

10. At the meetings in Ripley, Mr. Cotton also advised us that we could continue to make those sales without revealing the identity of those customers to the Plaintiff. To track and allocate commissions on sales of the Plaintiff's products, Mr. Cotton told us to report our sales of

the products to the Plaintiff as if they were sold to one of two companies: (a) a medical products distributor in Arkansas (Mr. Cotton's sales territory); and (b) CP Medical, a medical products distributor located in Portland, Oregon. He said that the Plaintiff would enter into contracts with those companies. Mr. Cotton never told us that MPI would not be eligible for the discounted price from the Plaintiff if we did not sell the product to either of those companies.

11. Because of the proprietary nature of MPI's existing customer information, MPI would not have purchased products from the Plaintiff if MPI was required to disclose that information without adequate assurances of confidentiality.

12. MPI does not have a copy of any written rebate policy or rebate contract from the Plaintiff. I do not believe it was ever provided with it or any other written document providing instructions on how to submit rebate claims.

13. After entering into that direct purchasing arrangement, MPI routinely ordered needles and syringes from the Plaintiff, submitting purchase orders to the Plaintiff's Palantine, Illinois offices and receiving the products from its distribution center in Atlanta, Georgia. MPI regularly submitted rebate claim forms pursuant to the oral instructions provided by Mr. Cotton identifying the company in Mr. Cotton's sales territory or CP Medical.

14. At no point prior to July, 2003 did Mr. Cotton or anyone else from the Plaintiff indicate there was anything wrong with the rebate forms or question MPI's entitlement to the price discount.

15. In July, 2003, Joseph Burke, an auditor for the Plaintiff, called me. He said he knew MPI was not selling the needles and syringes to CP Medical and demanded that MPI disclose the identity of its customers. Despite of MPI's policy against divulging that type of information, I was willing to make an exception to resolve this dispute, provided the Plaintiff: (1)

agree to keep that information confidential and not attempt to take MPI's customers away from it; and (2) supply MPI with a copy of the Plaintiff's written rebate policy and rebate contract.

16. After initially telling me the Plaintiff would provide those things, Mr. Burke changed his mind. In an e-mail dated August 29, 2003, Mr. Burke wrote that the Plaintiff was "not required" to provide such assurances that it would not take MPI's customers.

17. Over ten months later and without further negotiations, the Plaintiff initiated this lawsuit.

18. Litigating this case in Boston, Massachusetts will put a huge strain on MPI's resources. It will cost us tens of thousands of dollars extra in travel and time away from our business. If the case were to proceed to trial, most of MPI's current employees, including all of its senior employees, would likely be called as witnesses. As a result, MPI would likely be forced to shut down its operations during trial, which would result in lost sales and revenue for MPI and could jeopardize our future relationship with our customers.

SIGNED UNDER THE PENALTIES OF PERJURY, this 31st day of August, 2004.

_____
Eddie McCafferty