UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TYCO HEALTHCARE GROUP LP<br><br>      Plaintiff,<br><br>  v.<br><br>MEDICAL PRODUCTS, INC.<br><br>      Defendant. | Civil Action No. 1:04-cv-11524-DPW |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY AND MOTION FOR SUPPLEMENTAL PROTECTIVE ORDER CONCERNING MPI'S CUSTOMERS' NAMES**

Defendant Medical Products, Inc ("MPI") submits this Opposition to Plaintiff Tyco Healthcare's Motion to Compel, which seeks discovery of MPI's trade secrets, and requests a supplemental protective order protecting that information. The Plaintiff seeks disclosure of the names and identities of MPI's customers, which is the single most valuable piece of proprietary information that MPI has. MPI's customer names are valuable trade secrets, the secrecy of which MPI has taken repeated measures before and during this litigation to protect. Disclosure of MPI's customer names and identities, especially to an aggressive and hostile competitor such as the Plaintiff, would result in serious economic harm to MPI, possibly causing it to lose significant segments of its business and threaten its economic viability. Further, the Plaintiff has not met its burden of showing how the trade secrets are relevant or necessary to this litigation. Because the harm that MPI and others would suffer from the disclosure of its trade secrets clearly and substantially outweighs the need, if any, for the Plaintiff to have access to the

information, the Court should deny Plaintiff's motion to compel and/or enter a supplemental order protecting MPI's customer names from disclosure.

## BACKGROUND

**A.    The Facts**

    **1.    The Parties and Steps MPI Has Taken to Protect Customer Information**

The Plaintiff – a wholly-owed subsidiary of the multinational conglomerate Tyco International Ltd. – is a manufacturer and distributor of numerous healthcare products, which include medical needles and syringes.  MPI is a small, family-owned medical products distributor located in Ripley, Mississippi, which from shortly after its inception 1986 through August of 2003 distributed needles and syringes manufactured by the Plaintiff and other manufacturers to smaller distributors.  See Supplemental Affidavit of Eddie McCafferty ("McCafferty Supp. Aff.,"), filed herewith, ¶¶ 2-3.

Numerous other medical products distributors exist and MPI's customers could easily purchase the same products elsewhere.  MPI competes based on price, service and the relationship it has cultivated with its customers.  McCafferty Supp. Aff. ¶ 4.  To protect those relationships, MPI keeps information about its customers confidential and generally does not share their identities or purchasing information with manufacturers or distributors.  Id.  MPI safeguards that information by compiling it on a secure computer database, which is available exclusively to MPI employees who have valid usernames and passwords.  Id., ¶ 5; Affidavit of Melissa Owens, filed herewith, ¶ 3.  As an extra measure of protection, MPI also requires employees to execute confidentiality agreements, in which employees acknowledge that MPI's "client lists" and related pricing information are of "great value" to MPI, and the disclosure of

that information could cause "substantial business and financial losses" to the company. See Confidentiality Agreement, attached at Tab A to McCafferty Supp. Aff.

Prior to 1999, MPI purchased needles and syringes manufactured by the Plaintiff indirectly from other distributors without revealing any of its customers. McCafferty Supp. Aff., ¶ 7.

### 2. MPI's Direct Business Relationships With the Plaintiff

In 1999, the Plaintiff contacted MPI, indicated that it knew MPI was selling its products, and offered to sell them to MPI directly under a purchasing arrangement that also did not require MPI to disclose its customer information. McCafferty Supp. Aff., ¶ 8. A year or so later, the Plaintiff contacted MPI and requested such information. Id., ¶ 9. Concerned about divulging that information and that the Plaintiff would attempt to take its customers from it, MPI refused to provide that information and the Plaintiff thereafter terminated the direct purchasing arrangement. Id., ¶ 9.

MPI resumed purchasing products directly from the Plaintiff in March of 2001, when the Plaintiff's sales representative, Rob Cotten, orally offered to resume selling products to MPI. McCafferty Supp. Aff., ¶ 10. Although the Plaintiff claims that the written documents – a so called "Rebate Contract" and "Rebate Policy"– "*could not be more explicit in notifying MPI*" of its obligations to report its customers to the Plaintiff (P. Mem. at 3) (emphasis added), the reality is quite different. The so-called "Rebate Contract," which the Plaintiff does not submit to the Court, but which are attached at Tab B to McCafferty's Supplemental Affidavit actually have the words "Distributor Pricing Agreement" or "REBATE CONTRACT NOTIFICATION" printed on them. See Tab B to McCafferty Supp. Aff. at MPI-0150, MPI-0169. The documents *nowhere* mention any reporting requirement; instead, they merely list the Plaintiff's products

available for purchase and the distributor's "net cost" or "approved price."  <u>See</u> <u>id.</u>  Further, those documents were not signed by the Plaintiff or MPI.  <u>See</u> <u>id.</u>

In an attempt to engraft a reporting requirement into the so-called "Rebate Contracts," the Plaintiff points to language printed at the bottom of the last page of the "REBATE CONTRACT NOTIFICATIONS," stating:

> KENDALL, WITH WRITTEN NOTICE, MAY CANCEL THIS AGREEMENT AT ANYTIME PRIOR TO THE EFFECTIVE DATE OR WITH 30 DAYS NOTICE AFTER THIS AGREEMENT BECOMES EFFECTICE.  AGREEMENT NUMBER MUST APPEAR ON ALL REBATE CLAIMS.  USE OF THIS AGREEMENT CONSTITUTES ACCEPTANCE BY THE DEALER OF KENDALL'S REBATE POLICY DATED AUGUST 30, 1994.

<u>See</u> <u>id.</u> at MPI-0153.  It is that 1994 "Rebate Policy" that the Plaintiff point towards as imposing a duty upon MPI to report what customers purchase the Plaintiff's products.  <u>See</u> P. Mem. at 3-4. While the Plaintiff claims it mailed a copy of that 1994 Rebate Policy to MPI, no one at that company recalls receiving it (<u>see</u> Answer, ¶ 25) and discovery has shown that MPI did not have a copy of that policy in its files, and that the Plaintiff does not have a signed version of it.

The terms of the 2001 purchasing arrangement were explained to MPI by Mr. Cotten, who met with the MPI employees at its office in Ripley, Mississippi several times in late 2000 or early 2001.  McCafferty Supp. Aff., ¶ 11.  While Mr. Cotten was well aware based on their past dealings that MPI sold its products to numerous distributors, he never informed Mr. McCafferty or anyone else at MPI that they could not continue to sell the Plaintiff's products to those customers.  <u>Id.</u>  To the contrary, Mr. Cotten told MPI to report the sales on rebate claim forms to the Plaintiff as if they were made to one of two companies – CP Medical, another medical products and veterinarian distributor located in Portland, Oregon and Fort Smith Surgical Supply Co. ("Fort Smith"), a medical products distributor in Arkansas, which included Mr. Cotten's

4

sales territory.  Id., ¶ 12.  Mr. Cotten said the rebate claim forms were used by the Plaintiff to assign proper sales commissions, which on information and belief represented a portion of his salary.  Id.

Pursuant to Mr. Cotten's express instructions, MPI purchased the Plaintiff's products and submitted "rebate" claim forms.  McCafferty Supp. Aff., ¶ 13.  In 2002, Mr. Cotten advised Mr. McCafferty that the Plaintiff was going to sell needles and syringes directly to Fort Smith, and therefore Fort Smith would not continue to purchase products from MPI and the company should stop reporting sales to Fort Smith.  Id., ¶ 15.  However, MPI's purchase and sales of the Plaintiff's products otherwise continued through mid-2003.  Id., ¶ 16.

In mid-2003, Joseph Burke, a rebate claim auditor for the Plaintiff, contacted Mr. McCafferty and requested that he offer proof that MPI actually had sold products for the past two years to CP Medical or one of its customers.  McCafferty Supp. Aff., ¶ 17.  Mr. McCafferty and others at MPI discussed these requests with Mr. Cotten, who assured them that he would take care of it.  Id., ¶ 17.  Despite MPI's policy against divulging that type of information, Mr. McCafferty subsequently offered to make an exception to resolve this dispute, provided that the Plaintiff: (1) agree to keep that information confidential and not attempt to take MPI's customers away from it; and (2) supply MPI with a copy of the Plaintiff's written rebate policy and rebate contract.  Id., ¶ 18.  After initially indicating a willingness to do those things, Mr. Burke abruptly changed his position, informing Mr. McCafferty on or about September 2, 2003 that his proposal to do those things was merely a "hypothetical," and claimed the Plaintiff was "not required" to provide such assurances.  Id., ¶ 19.  At that point, Mr. McCafferty declined to provide the requested information.  Id.

Since then, MPI has switched approximately 126 of the 155 customers who had purchased the Plaintiff's products from 2001 through 2003 to products manufactured by Terumo Medical Corporation ("Terumo"), a needle and syringe manufacturer whose product competes directly with the Plaintiff's products. McCafferty Supp. Aff., ¶ 20. Plaintiff's and Terumo's products are very similar and MPI's customers decide what product to buy based primarily on price. Id. If the Plaintiff was permitted to discover MPI's customer identities and related pricing information, it would give the Plaintiff a significant competitive advantage because it would know to whom to sell its products and for what price. Id., ¶ 21. The Plaintiff could utilize this detailed information to take additional customers from MPI and MPI's customers. Id., ¶ 22.

**B.    Plaintiff's Claims and MPI's Defenses**

On July 7, 2004, the Plaintiff filed a complaint alleging MPI violated the terms of the "Rebate Contract," by selling its products to customers other than CP Medical and by submitting allegedly false rebate claims to the Plaintiff. Based on that conduct, the Plaintiff's complaint alleges that MPI: (1) breached its contract and the implied theory of good faith (Counts III & IV); (2) defrauded, misrepresented and deceived the Plaintiff (Count II); and (3) violated Mass. Gen. L. ch. 93A, § 11 (Count I). See Complaint, ¶¶ 36-56. The Plaintiff claims it incurred actual damages of $432,287.87, which it calculates based on the amount of the rebate claims submitted by MPI from 2001 through 2003, and offered to settle this case for treble that amount. See Plaintiff's Rule 16.1(C) Settlement Proposal, attached at Tab A to the Supplemental Affidavit of Michael B. Galvin, Esq. ("Galvin Supp. Aff.")

MPI has admitted that it sold Plaintiff's product to customers other than CP Medical (see Answer, ¶ 28) and will not dispute that issue at trial. However, MPI denies that by doing so it violated any contract or defrauded the Plaintiff because it was not aware of the restrictions

6

supposedly imposed in the 1994 Rebate Policy and because the Plaintiff's sales representative instructed MPI employees to fill out the claim forms in the way that they did. Answer, ¶¶ 25-28. MPI would not have entered into the 2001 purchasing arrangement with the Plaintiff if it had known it was required to disclose its customers. Id., ¶ 25.

**C.**     **Discovery Dispute**

In its Request for Production of Documents, the Plaintiff sought the names and identities of the customers who purchased the Plaintiff's products from MPI. See Plaintiff's First Request for Production of Documents, Request No. 9. (requesting "[a]ll documents concerning the sales, delivery or other disposition by MPI of products purchased by MPI under the Rebate Contract"). MPI responded by notifying counsel for the Plaintiff that MPI had responsive information from the computer database described above in the form of a "Ticket History Report," which reveals detailed information about MPI's purchases of the Plaintiff's products from 2001 through 2003, including the identity of customers who purchased the product, the purchase and resale price, the dates of purchase and MPI's profit margin. A non-redacted copy of this document is filed *in camera, under seal* as Tab B to the Galvin Supplemental Affidavit.

To protect its highly confidential customer information contained in this report, MPI objected to the production of the entire report, but produced a redacted version, which reflects all of the information except the customer names. See Defendant's Response and Objections to Plaintiff's First Request for Production of Documents, No. 9. ("MPI will produce documents reflecting the sale by MPI of products purchased by the Plaintiff, but redacted to not disclose [] trade secrets and/or other confidential information reflected in those documents."). The first page of that 145-page report is attached to the Plaintiff's Memorandum.[1]

---

[1] Consistent with MPI's objection to producing this information, Mr. McCafferty also refused to answer questions posed to him at his January 5, 2005 deposition that would have revealed the names of his

7

Counsel for MPI offered to furnish all other relevant information, for instance by using pseudonyms for the customers names redacted from the Ticket History Report (such as "Customer No 1" purchased the first 10 items on page 1 and "Customer No. 2" purchased the next 8 items on that page), so that the Plaintiff could tell how many different customers purchased the products and how many products each customer purchased. Galvin Supp. Aff., ¶ 7. Counsel for MPI also offered to disclose which of those customers were veterinarian distributors. Id. Counsel for the Plaintiff rejected those proposals and requested disclosure of the names of MPI's customers. Id.

Counsel for the parties also disagreed about the meaning of the Protective Order, which this Court issued on December 28, 2004. If MPI designates the Ticket History Report as "Confidential-Attorney's Eye's Only" and discloses it to counsel for the Plaintiff, MPI's counsel's belief is that the Plaintiff could not use that information for any reason, including to take discovery from the entities listed on that report, because paragraph C(3) of the Protective Order restricts the dissemination of information designated as "Confidential-Attorney's Eye's Only" to "the judge, law clerk, courtroom and docket clerks and other court personnel." Galvin Supp. Aff. ¶ 9. Counsel for the Plaintiff has refused to commit to MPI's counsel's interpretation of the Protective Order, acknowledging that the Plaintiff would have think about how it could use the information, but refusing to accept MPI's counsel's interpretation of the Order without first receiving the non-redacted document. Id., ¶ 9.

On January 11, 2005, the Plaintiff moved for an order compelling the production of this information.

---

customers at MPI's counsel's instruction. MPI's counsel offered to postpone Mr. McCafferty's deposition until after the issues raised in the motion to compel were resolved, but counsel for the Plaintiff elected not to do so. Galvin Supp. Aff., ¶ 10.

**ARGUMENT**

**This Court Should Deny Plaintiff's Motion to Compel Because It Is Not Entitled to Discovery of MPI's Highly Confidential Customer Information.**

Federal Rule of Civil Procedure 26 explicitly exempts trade secrets and other confidential information from discovery, stating that the court may enter a protective order, "that a trade secret or other confidential … or commercial information not be revealed or be revealed only in a designated way." Fed. R. Civ. P. 26 (c)(7). Once a party establishes that the information is a trade secret, the disclosure of which might cause harm to that party, the burden shifts to the party seeking discovery to prove that the information sought is relevant and necessary to the litigation. See In re Independent Serv. Org. Antitrust Litig., 162 F.R.D. 355, 356 (D. Kan. 1995); ITT Electro-Optical Prods. Div'n v. Elec. Tech. Corp., 161 F.R.D. 228, 231 (D. Mass. 1995). The names and identities of MPI's customers are trade secrets that are not necessary to prove the claims, defenses or damages in this case, and the Court should deny the motion to compel and/or issue a supplemental protective order exempting that information from discovery.

    1.    **MPI's Customer Lists and Customer Names are Trade Secrets.**

Federal courts sitting in diversity apply state law when determining whether information constitutes a trade secret. See Smith v. BIC Corp., 869 F.2d 194, 199 (3d Cir. 1989)("While we apply the Federal Rules of Civil Procedure in this diversity case, we apply the law of Pennsylvania in our determination of what constitutes a trade secret."); Hamilton v. State Farm Mut. Auto. Ins. Co., 204 F.R.D. 420, 423 (S.D. Ind. 2001)(looking to Indiana law to determine whether party's claims handling policies, practices, and procedures constituted a protectable trade secret entitled to protection under Rule 26(c)(7)). MPI's customer lists and names

constitute trade secrets under either Mississippi or Massachusetts law.[2]  Mississippi has adopted the Uniform Trade Secret Act ("MUTSA"), Miss. Code §§ 75-26-1 to 19 (2000), which defines a "trade secret" as information that:

(a) is economically *valuable* and *not generally known* to other persons who can obtain economic value from its disclosure or use; and

(b) the company took *steps to protect its secrecy*.

See Miss. Code § 75-26-3(d).  Similarly, Massachusetts, which looks to the Restatement of Torts when considering whether information is a trade secret,[3] makes basically the same inquiry, analyzing (a) whether the information is valuable (Restatement factors 4 and 5) and not generally known (Restatement factors 1, 2, 6) and (b) whether the company took steps to maintain the secrecy of the information (Restatement factor 3).

### a. **MPI's Customer Information is Valuable and Not Generally Known Outside of MPI.**

"[C]ustomer identities and related information can be a company's most valuable asset and may represent a considerable investment of resources."  Rest. (3d) of Unfair Competition §

---

[2] Mississippi law governs at least the core contract claims.  The "Rebate Contracts," which were drafted by the Plaintiff, do not contain a choice of law provision and Mississippi is the state with the most significant relationship to the transaction and the parties, including the place where the parties met and entered into the direct purchasing relationship and where the alleged breaches took place.  Princess House, Inc. v. Lindsey, 136 F.R.D. 16, 23 (D. Mass. 1991) (quoting Restatement (Second) of Conflicts of Laws § 188(1) (1971) (absent choice of law by parties, their rights are determined by local law of state which has the most significant relationship to transaction and parties)).  Because Massachusetts and Mississippi law are not in conflict on this issue, this Court does not have to resolve the choice of law issue.

[3] See Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972)("Under the Restatement, there are six factors of relevant inquiry:  (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others")(citing Rest. of Torts, § 757, comment b).

42, comment f.  As a distributor in the highly competitive field of medical products, MPI's customer lists and customer names constitute its lifeblood because its business depends on knowing to whom to sell products and for what prices.  It is that information that enables MPI to determine whether it is economically viable or not to distribute particular products, and without which MPI could not make a profit or stay in business.  See McCafferty Supp. Aff., ¶¶ 4, 22-23.

Courts have routinely recognized that customer lists and identities constitute trade secrets.  See, e.g., James v. Hudgins, 261 F. Supp.2d 636, 641 (S.D. Miss. 2003)(holding that an employer's customer list clearly fell within the definition of trade secret); Star Scientific, Inc. v. Carter, 204 F.R.D. 410, 415 (S.D. Ind. 2001)(finding that information relating to customer lists, and consumer purchasing habits were protectable trade secrets); Union Nat'l Life Ins. Co. v. Tillman, 143 F. Supp.2d 638, 644 (N.D. Miss. 2000)(finding that the names of an insurer's customers were protected trade secrets); Fred Stores of Mississippi, Inc. and M&H Drugs, Inc., 725 So.2d 902, 908-09 (Miss. 1998)(pharmacy's customer list had "economic value" because it was information not known to the defendant or generally ascertainable by proper means, and the defendant could obtain economic value from the disclosure of the list); Duracell Inc. v. SW Consultants, Inc., 126 F.R.D. 576, 578 (N.D. Ga. 1989)(customer lists were confidential trade secrets that could be harmful if disclosed in discovery).

It is undisputed that MPI's customer information is not known outside of the company – the Plaintiff's request for court-ordered disclosure of this information proves that much.  Contrast Stephen LaFrance Pharmacy, Inc. v. Tallant, No. 3:97CV104-B-A., 1997 WL 392736 (N.D. Miss. June 25, 1997)(customer list not a trade secret where the customers' identities were readily ascertainable).  MPI's customer information is particularly not ascertainable in the detailed format provided in MPI's Ticket History Report, which reveals not just what customer

purchased what product, but also exposes the exact quantity, date of purchase, purchase price and MPI's margin of profit.  See Ticket History Report, attached at Tab A to Galvin Supp. Aff.

### b. **MPI Has Maintained the Secrecy of Its Customer Information.**

Given its critical importance, it is not surprising that MPI has taken steps to keep its customer names and identities a secret, which include:

- Keeping information about its customers confidential and generally not sharing their identities or purchasing information with manufacturers or distributors. McCafferty Supp. Aff., ¶¶ 4, 7-11.

- Maintaining customers lists and purchasing histories on a secure, password-protected computer database, which is available only to certain MPI employees. Id., ¶ 5; Owens Aff., ¶ 3.

- Requiring MPI employees who have access to that information or other customer information to execute confidentiality agreements, in which the employee expressly acknowledges that the client information is of "great value" to MPI and "shall be kept confidential" during his or her tenure at the company and thereafter, with "monetary damages" against the employee for failing to do so.  See Confidentiality Agreement, Tab A to McCafferty Supp. Aff.

That MPI keeps its client information a secret is likewise demonstrated by its prior dealings with the Plaintiff, wherein MPI has repeatedly rejected the Plaintiff's efforts to obtain MPI's client information.  The first rejection came at the end of MPI's original 1999 direct purchasing arrangement with the Plaintiff, when its representatives asked for disclosure of MPI's customers and MPI refused to divulge that information.  McCafferty Supp. Aff., ¶ 8.  MPI again rejected the Plaintiff's efforts to obtain that same information in August 2003, when the Plaintiff sought disclosure of MPI's customers a second time.  In that instance, Mr. McCafferty sought to have Mr. Burke confirm his oral assurances to Mr. McCafferty that the Plaintiff would not use the information in an attempt to take MPI's customers.  Id., ¶ 19 (attaching e-mail to Burke).  But Mr. Burke refused to put what he told him on telephone calls in writing, dismissing what he said

about a non-compete agreement as a "hypothetical" intended "to determine whether you'd provide true invoice information." Id. (attaching Burke e-mail).

Despite MPI's consistent efforts to protect its customer information, the Plaintiff argues that information is not a trade secret because it claims that Plaintiff's "policies and contractual obligations to which MPI agreed explicitly" and which the Plaintiff tells this Court "could not be more explicit in notifying MPI" of its disclosure obligations. P. Mot. at 1-2; P. Memo. at 3-4, 9. That is not accurate. As discussed above, there is no signed document that imposes those obligations on MPI. Instead, the Plaintiffs – a multi-billion dollar corporation – chose to rely on their commissioned sales representatives' oral representations to distributors such as MPI about the terms of the contracts and alleged reporting requirements. The evidence in this case will demonstrate that Mr. Cotten told MPI employees that they could continue to sell the Plaintiff's products to MPI's numerous existing customers without disclosing MPI's actual customers' identities to the Plaintiff and to report the sales as if they were made to CP Medical or another company. Mr. McCafferty already testified to those facts at his deposition; other current or former MPI employees will confirm that they received similar instructions from him. See McCafferty Supp. Aff., ¶¶ 11-12.

### 2.    Disclosure of MPI's Customer List and Names to the Plaintiff Might Harm MPI.

Disclosure of MPI's customer names and purchasing histories could do significant damage to MPI. Since the most recent direct purchasing arrangement ended in July of 2003, MPI has switched most of its customers from the Plaintiff's products to very similar products offered by Terumo, one of the Plaintiff's chief competitors in the needle and syringe markets, and MPI continues to sell those products to those customers to this day. McCafferty Supp. Aff., ¶ 20. Providing detailed customer and pricing information such as that contained in the Ticket

History Report would supply the Plaintiff with a significant competitive advantage inasmuch as the Plaintiff would have detailed purchasing information over an extended period of time and thus could propose to sell to those customers directly without MPI at prices below those offered by MPI. Id., ¶ 21.

MPI's fears that it would lose customers to the Plaintiff are well-founded. During the negotiations involving the 2001 direct purchasing arrangement, MPI informed the Plaintiff that it was selling its products to Fort Smith, another medical product distributor located in Arkansas. See McCafferty Supp. Aff., ¶ 15. Yet just a year later in 2002, Mr. Cotten told Mr. McCafferty that the Plaintiff had begun selling its products to Fort Smith directly. Id. Fort Smith has not purchased any needles or syringes from MPI since then and MPI believes that it has been purchasing products from the Plaintiff instead. Id. The Plaintiff could similarly take the rest of MPI's needle and syringe customers "direct" and cut MPI out of that business altogether. See Ares-Serona, Inc. v. Organon Int'l B.V., 151 F.R.D. 215, 219 (D. Mass. 1993) (the risk of competitive injury is particularly high when the opposing party is a business competitor) (citing American Standard Inc. v. Pfizer Inc., 828 F.2d 734, 741 (Fed.Cir. 1987)(collecting cases in which court presumes disclosure is more harmful to competitor)); Cytodyne Tech. Inc. v. Biogene Tech Inc., 216 F.R.D. 533, 536 (M.D. Fla. 2003)(disclosure to a competitor is more harmful than disclosure to a non-competitor).

Losing a significant percentage of those customers could be a crippling financial blow for MPI. In recent years, sales of needle and syringes constituted approximately 23% of MPI's overall sales. McCafferty Supp. Aff., ¶ 23. Additionally, of the 126 or so clients who names appear on the Ticket History Report and still purchase needles and syringes from MPI, virtually all of those customers purchase other medical products from MPI as well. Id. If those customers

stop purchasing needles and syringes from MPI, it is likely that they will stop also purchasing those other products and MPI may not be able to withstand the financial repercussions of the loss of that business.  Id.

Disclosure would put MPI's customers – who are not parties to this litigation and are not alleged to have done anything improper – at risk of harm as well.  As it concedes in its filings, the Plaintiff is seeking to determine the ultimate end user of the products sold by MPI from 2001 through 2003.  See P. Mem. at 7.  Because MPI's customers are also distributors, the Plaintiff invariably will insist that each of those distributors produce their client lists and sales data as well.  Apart from the significant expense and inconvenience for them, it also puts their business in jeopardy given the likelihood that the Plaintiff might cut those distributors out of the distribution chain as well by selling to their customers directly.  Cf. Drexel Heritage Furnishings, Inc. v. Furniture USA, Inc., 200 F.R.D. 255, 261-62 (M.D.N.C. 2001)(defendant made sufficient showing of harm to warrant order protecting confidentiality of its suppliers based on potential harm to suppliers if names were disclosed in discovery); Independent Serv. Org. Antitrust Litig., 162 F.R.D. at 356 (party seeking protective order made adequate showing of harm based on harm to its suppliers if their names were disclosed).

Those harms are not currently addressed or resolved by the Protective Order entered in this case.  First, even for documents designated with the highest "Confidential-Attorney's Eyes Only" level of protection, the Plaintiff's Counsel would still be authorized to share the information with certain employees of the Plaintiff (see Protective Order at ¶ C(3) (authorizing parties to share such information with "in-house counsel, who are actively involved in the preparation for trial and trial of the Action")), MPI objects to any disclosure to the Plaintiff's employees given the Plaintiff's repeated efforts to identify MPI's customers, taking of at least

15

one customer from MPI, and aggressiveness and hostility towards the company. Cf. Independent Serv. Org. Antitrust Litig., 162 F.R.D. at 356-57 (protective order that allowed for dissemination of materials marked as "attorney's eye's only" to in-house counsel inadequate because of risk of inadvertent disclosure caused risk of harm).

Second, the Protective Order does not provide any protection for harm caused to MPI's customers or restrict the Plaintiff from using information obtained from those entities against MPI or against those entities.

Third, the parties disagree in their interpretations of the Protective Order. If MPI designates the "Ticket History Report" as "Confidential-Attorney's Eye's Only" and discloses it to counsel for the Plaintiff, MPI's counsel's belief is that the Plaintiff could not use that information for any reason, including to take discovery from those entities, because the Protective Order restricts the further dissemination of information designated as "Confidential-Attorney's Eye's Only" to "the judge, law clerk, courtroom and docket clerks and other court personnel." See Protective Order at ¶ C(3); Galvin Supp. Aff., ¶ 9. Counsel for the Plaintiff has refused to commit to MPI's counsel's interpretation of the Protective Order, insisting that counsel for MPI first produce the non-redacted document before disclosing what he will do with the information. Id.

        **3.**     **The Plaintiff Has Failed to Establish that Customer Names Are Relevant and Necessary to Prove Any Disputed Issues in this Litigation.**

The identities of MPI's individual customers are not relevant to the issues in the case, nor necessary to establish liability or damages, or refute any defense. As indicated above, MPI has never disputed that it actually sold the Plaintiff's products to companies other than CP Medical. See MPI Answer, ¶ 28 ("MPI admits that it submitted rebate claims to Kendall during that time period which … listed CP Medical as the customer even though the product actually was sold

16

elsewhere."). MPI has offered to provide and/or has already produced *all* information regarding its customers – including their size, the nature of their business (including whether medical or veterinary), the products purchased from MPI, the purchasing price, and the profit earned by MPI per customer – *except* their names. Galvin Supp. Aff., ¶¶ 7-8.

Despite all of that information, the Plaintiff makes four arguments in an attempt to comply with its obligation to show that the customer names are relevant in this litigation. First, the Plaintiff argues that the customer names are necessary to prove that MPI did not sell the Plaintiff's products to CP Medical as indicated on rebate claims and invoices. P. Mem. at 6. MPI has explicitly admitted this in its Answer and offered to enter into a stipulation about that fact. See Galvin Supp. Aff., ¶ 4. Disclosure of MPI's customer names would add nothing to issues not in dispute.

Second, the Plaintiff argues – in conclusory fashion – that it is necessary to discover the names of MPI's customers because the Plaintiff is entitled to discovery from those customers that "will lead to admissible evidence about MPI's fraudulent diversion of products to customers and markets, such as veterinarians and veterinary markets." P. Mem. at 7. Again, this information is addressed by MPI's offer to stipulate to other information about its clients, including what customers sold products to veterinary markets and how much product was sold that way. See Galvin Supp. Aff., ¶¶ 7-8. The customers' names are not relevant to those inquiries.

Third, the Plaintiff insists that the customer names are necessary to refute MPI's defense that it was following the direction of the Plaintiff through its representative, Rob Cotten. P. Mem. at 8. However, the Plaintiff fails to explain why that is so. Given that MPI has not claimed that its customers were involved in any way with those negotiations, the names of

17

Plaintiff's customers are simply not relevant to this issue and would add nothing to discovery regarding the interaction between Rob Cotten and MPI.

Finally, Plaintiff indicates that MPI's customer names are relevant to its ability to prove damages without explaining how. P. Mem. at 8. Even without the names of any of MPI's customers, the Plaintiff already claimed damages of $432,287.87, which it calculates based exclusively on the rebate claims MPI submitted directly to the Plaintiff. See Plaintiff's Rule 16.1(C) Settlement Proposal, Tab B, Galvin Supp. Aff. Even to the extent that the Plaintiff is ready to concede that its proposed damages calculation is wrong,[4] other possibly relevant information about damages – including the amount MPI sold the products for and MPI's profits on those sales – is already reflected in the non-redacted portions of the Ticket History Report previously produced by MPI. Without the customer names, the Plaintiff has received more than sufficient information about alternative damages theories.

### 4. The Substantial Harm to MPI from Disclosure of its Trade Secrets Outweighs the Relevance and Necessity of the Information in this Litigation.

But even if the Plaintiff could show that MPI's customer names were somehow relevant to any disputed issue between the parties, the Plaintiff's Motion to Compel should still be denied because the significant risk of harm to MPI outweighs the relevance of the information in this case. The likelihood and magnitude of that harm is particularly great where MPI is a small company with a limited customer base, and disclosure is sought by a large competitor that has demonstrated aggressive customer solicitation in the past. Cf. Ares-Serona, 151 F.R.D. at 219 (the risk of competitive injury is particularly high when the opposing party is a business competitor). The balancing of MPI's interest in protecting its customers' identities against the

---

[4] The Plaintiff's measure of damage has no relation to actual harm suffered by the Plaintiff, and would constitute a windfall given it would not have sold products for the pre-rebate amount.

Plaintiff's need for the information to prove its case clearly weighs in favor of MPI and the trade secrets should be protected from disclosure.

In many respects, this case is similar to Independent Serv. Org. Antitrust Litig., where copier manufacturer Xerox alleged that a copier part retailer, CSU, was improperly acquiring and selling Xerox copier parts obtained through parts suppliers and sought discovery from CSU of the names of those suppliers. 162 F.R.D. at 356-57. Despite the existence of a Protective Order in which CSU could designate the documents for disclosure for "attorney's only," the Court agreed with CSU that disclosure of "all information regarding the parts obtained from the confidential suppliers, except the identities of the confidential suppliers" was sufficient to provide Xerox with the relevant and necessary information, where CSU showed that both it and its suppliers were at risk of having Xerox take further steps to shut off supplies to them, perhaps even inadvertently, if those suppliers' identities were revealed under the existing protective order. Id. at 358-59. Thus, the Court granted a supplemental protective order permitting CSU not to disclose the names of its suppliers to Xerox. Id.

This case is also like Drexel Heritage Furnishings, Inc. v. Furniture USA, Inc., 200 F.R.D. 255, 261-62 (M.D.N.C. 2001), where a furniture manufacturer who accused a furniture retailer of falsely advertising furniture it sold to customers as purchased directly from the manufacturer, sought to discover the names of the retailer's actual distributors. 200 F.R.D. at 257-58. The Court entered a protective order safeguarding the specific names of those distributors, and suggested that it would have allowed the defendant retailers to produce all information about the supplies with the suppliers' names redacted, if the parties had requested that relief. 200 F.R.D. at 262 ("While not mentioned by the parties, another way of dealing with

this situation would be for defendants to produce information with the suppliers identities redacted."). Here, MPI has proposed that very solution.

## CONCLUSION

For the foregoing reasons, the court should deny Plaintiff's Motion to Compel and/or issue a supplemental protective order exempting the redacted portions of MPI's Ticket History Report from discovery in this case.

## REQUEST FOR ORAL ARGUMENT

MPI requests, pursuant to Local Rule 7.1(D), oral argument concerning its opposition to Plaintiff's Motion to Compel and request for supplemental protective order.

Respectfully submitted,

MEDICAL PRODUCTS, INC.

By its attorneys,

/s/ Michael B. Galvin
_____
Michael A. Collora (BBO No. 092940)
Michael B. Galvin (BBO No. 630515)
DWYER & COLLORA, LLP
600 Atlantic Avenue
Boston, Massachusetts 02210-2211
Tel: 617-371-1000
Fax 617-371-1037

Dated: January 27, 2005

## CERTIFICATION PURSUANT TO RULE 37(a) AND LOCAL RULE 37.1(A)

I, Michael B. Galvin, hereby certify that I have conferred on several occasions with Jeffrey D. Clements, counsel for the Plaintiff, in a good faith effort to resolve or narrow the area of dispute raised in this filing and have been unable to do so.

/s/ Michael B. Galvin
_____