UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TYCO HEALTHCARE GROUP LP<br><br>Plaintiff,<br><br>v.<br><br>MEDICAL PRODUCTS, INC.<br><br>Defendant. | Civil Action No. 1:04-CV-11524-DPW |

**PLAINTIFF TYCO HEALTHCARE'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUPPLEMENTAL PROTECTIVE ORDER AND IN REPLY TO DEFENDANT'S OPPOSITION TO MOTION TO COMPEL**

## I.   INTRODUCTION

Plaintiff Tyco Healthcare Group LP ("Tyco Healthcare") has propounded discovery seeking to learn how, why, to whom, and for what price Defendant Medical Products, Inc. ("MPI") unlawfully diverted needles and syringes (the "Products") that MPI purchased from Tyco Healthcare pursuant to a Rebate Contract among Tyco Healthcare, CP Medical, Inc. ("CP Medical") and MPI, which Rebate Contract explicitly applied only to Products that MPI sold to CP Medical.  Rather than selling the Products to CP Medical, the end-user customer identified in the Rebate Contract, MPI improperly sold the Products to other distributors, and then filed rebate claims with Tyco Healthcare that falsely stated that the Products had been sold to CP Medical.  Discovery related to the MPI's actual sales of the Products, without redaction or concealment of the identity of the distributors who participated in MPI's diverted sales, is relevant evidence to prove

MPI's intentional scheme, Tyco Healthcare's damages, and to refute MPI's defense that it did not understand the Rebate Contract or Tyco Healthcare's Rebate Policy.

MPI claims that the identity of the distributors to which MPI actually sold the Products that MPI falsely represented had been sold to CP Medical is a trade secret.  The only reason Tyco Healthcare does not know that information now, however, is because MPI lied about its intentions in entering into the Rebate Contract; lied on the rebate claim forms that stated the Products had been sold to CP Medical; lied when Joseph Burke, Tyco Healthcare's Manager of Rebate Audits asked for this information, and lied by submitting false invoices to mislead Mr. Burke.  (*See* Affidavit of Joseph Burke, attached as Exhibit 4 to Memorandum in Support of Tyco Healthcare's Motion to Compel ("Burke Aff.") ¶¶ 8-16; Exhibit 1, Deposition of Medical Products Inc. ("MPI Dep.") at 154; 176; 216-218; 251-252; 254; 257-269).  MPI's motion for protective order demands acceptance of the dubious proposition that these repeated false statements and fraudulent documents are a legitimate method of protecting "trade secret" information.  Tyco Healthcare respectfully requests that the Court reject MPI's proposition, deny MPI's motion for protective order, and allow Tyco Healthcare's motion to compel production of non-redacted documents.

## II.     ARGUMENT

In its continuing effort to conceal the extent and nature of its diversion and rebate fraud, MPI argues that MPI's "customer names are valuable trade secrets," and that "the identities of MPI's individual customers are not relevant to the issues in the case, nor necessary to establish liability or damages, or refute any defense." (Defendant's Opposition to Plaintiff's Motion to Compel Discovery and Motion for Supplemental

Protective Order Concerning MPI's Customers' Names ("Def. Mem.") at 1, 16).  MPI is incorrect on both counts.

MPI's trade secret contention is fundamentally flawed for at least three independent reasons.  First, MPI's assertion that it acted reasonably to ensure the secrecy of the identity of purchasers of the Products for which MPI claimed rebates under the Rebate Contract flies in the face of MPI's express agreement to provide exactly that information to Tyco Healthcare, quite apart from the question of whether the use of false statements and false documents can ever be deemed "reasonable" measures to protect secrecy.

Second, the information that MPI has redacted from the sales reports concerning the Products is not trade secret information in any event, and MPI's suggestion that Tyco Healthcare seeks MPI's "customer list" is misleading.  In fact, Tyco Healthcare seeks non-redacted copies of admittedly relevant documents that reflect the specific transactions concerning the Products at issue in this case.  The identity of particular distributors contained on non-redacted copies of the documents is not secret information, but is publicly available information.

Finally, MPI cannot demonstrate any legitimate harm from disclosure, and instead describes a "harm" that is caused by exposure and curtailment of its diversion scheme.  This type of harm is not what the trade secret privilege is intended to prevent.

As to the question of relevance, MPI has produced its sales reports and concedes the relevance of the discovery sought, but seeks to shield the specific identifying information of the distributors-- and material witnesses-- by a series of half-hearted offers of stipulation.  Tyco Healthcare should not be required to take MPI at its word on

3

relevant issues of intent and willfulness, the amount of ill-gotten gains, the markets to which the Products were diverted, and the extent of knowledge about MPI's scheme that is likely to be in the possession of the recipient distributors that participated in MPI's diversion business.

      **A.**    **The Identity of the Distributors To Which MPI Sold the Rebate Contract Products Is Not A Trade Secret.**

      **1.**    **MPI Agreed To Identify the Purchasers of the Products, And Thus Cannot Claim to Have Taken Reasonable Measures to Preserve the Secrecy of That Information.**

MPI was not required to use the CP Medical Rebate Contract to obtain Tyco Healthcare products, and could have acquired products for sale to customers other than CP Medical at Tyco Healthcare's distributor "into-stock" pricing, as most distributors do. (*See* Exhibit 2, Affidavit of Patrick McGrath ("McGrath Aff.") at ¶¶ 1-8). When MPI chose to use the CP Medical Rebate Contract, however, and chose to submit Rebate Claims under that contract, MPI explicitly agreed to identify the recipient of any Products about which MPI submitted rebate claims. (*See* Exhibit 2, McGrath Aff. at ¶¶ 4, 6; Affidavit of Erica Spendlove, attached as Exhibit 5 to Memorandum in Support of Tyco Healthcare's Motion to Compel ("Spendlove Aff.") ¶¶ 7-10).

MPI's claim of ignorance about this disclosure requirement is implausible and irrelevant. MPI suggests that Tyco Healthcare is attempting to "engraft a reporting requirement into the so-called 'Rebate Contracts. . ..'" (Def. Mem. at 4.) A "grafting" operation is hardly necessary. MPI concedes that it received the CP Medical Rebate Contract Notification, which is attached to the Supplemental Affidavit of Eddie McCafferty and was produced from MPI's records. (Rebate Contract, Attached as Exhibit B to Supplemental Affidavit of Eddie McCafferty ("Supp. McCafferty Aff.") at

4

MPI-0150; *See also* Exhibit 1, MPI Dep. at 185-6; 189).   On the cover of the Rebate Contract, Mr. McCafferty wrote "Kendall Contracts . . . CP."   (*Id.* at 186).  The document is entitled "**Rebate Contract** Notification." (Rebate Contract, Supp. McCafferty Aff., Exhibit B at MPI-0150) (emphasis added).   The Rebate Contract unequivocally states on the same page: "**Contract Valid for the Following Customers . . . Customer Name:  Cascade Pacific Med.**" [1]  (*Id.*)

MPI accepted this Rebate Contract, purchased the Products identified in the Rebate Contract, and then submitted over seventy Rebate Claims representing that the Products had been sold to CP Medical.  Each and every rebate claim that MPI submitted informed MPI that it was required to disclose the recipients of the Products purchased under the Rebate Contract:  MPI was required to complete the entry for **"End Customer Name:_____."** (*See* Burke Aff., Ex. 1).  In case more clarity was required, the rebate claim form stated that the "End Customer Name" was **"Required for Processing."**  (*Id.*)  In each case, MPI filled in the blank by writing "CP Medical."

MPI's professed ignorance that Tyco Healthcare's Rebate Policy required disclosure of customers receiving Products under the Rebate Contract is unsupported and not credible.  In addition to the Rebate Contract Notification stating that the "Contract Valid [Was] for the Following Customers . . . Customer Name:  Cascade Pacific Med," and the rebate claim forms requiring disclosure of the customer,  MPI received the Rebate Policy itself on at least two occasions.

In December 2001 and December 2002 Tyco Healthcare sent the updated Distribution Price List and a copy of the Rebate Policy to MPI and other distributors.

---

[1]   Tyco Healthcare had been led to believe that CP Medical was also known as Cascade Pacific Medical.

5

(*See* Exhibit 2, McGrath Aff. at ¶¶ 11-15, and McGrath Exhibits 1 and 2 at TH0807, TH0877).  That Rebate Policy states:

> A distributor is eligible to receive a contract rebate only if:
>
> \*     \*     \*
>
> 2.     The product was sold directly to a qualified customer eligible to purchase that product under a contract duly authorized by Kendall.
>
> **Kendall reserves the right to conduct audits of the distributor's purchases at reasonable times and the distributor agrees to cooperate fully in providing files and documents necessary for such audits.  Kendall audits will include, but not be limited to**, *review of each customers purchases from the distributor which become the basis for any distributors rebate claim.*
>
> \*     \*     \*
>
> *Proof of sale documents must identify hospital/end-user name*, address, zip code, invoice date, Kendall product code. . . .
>
> By signing the rebate request, the individual is certifying that the information is accurate and that the rebate request meets all the policy requirements.
>
> *(See Rebate Policy*, attached to Burke Aff. at Ex. 4.  *See also* TH0807, TH0877)

(emphasis added).

In contrast to these specific and written obligations of disclosure, MPI makes a weak and unsupported assertion that a Tyco Healthcare sales representative "told MPI representatives that they could continue to sell the Plaintiff's products to MPI's numerous existing customers without disclosing MPI's actual customers' identities to the Plaintiff and to report the sales as if they were made to CP Medical or another company."  (Def. Mem. at 13).[2]

---

[2]     Oddly, while MPI attempts to disregard the ample written documentation of the Rebate Contract and the Rebate Policy by claiming reliance on an alleged statement of a sales representative, MPI asserts that "the Plaintiffs [sic] - a multi-billion dollar corporation- chose to rely on their commissioned sales representatives' oral representations to distributors such as MPI about the terms of the contracts and alleged reporting requirements."  (Def. Mem. at 13).  Needless to say, only MPI is seeking to rely on such alleged

Until this action was filed, however, MPI never said anything about such a doubtful, and certainly unauthorized, alleged oral suggestion of a sales representative. Even in response to repeated inquiry by Tyco Healthcare's manager for rebate audits, Mr. McCafferty never hinted that anyone at Tyco Healthcare had authorized a Rebate Contract without truthful disclosure, and never said anything about an alleged oral statement of a sales representative about the rebate claim process. (Burke Aff. ¶ 10; Exhibit 1, MPI Dep. at 123; 269). On the contrary, Mr. McCafferty demonstrated that he knew about the disclosure requirement because he continued to claim falsely that MPI sold the Products to CP Medical or "drop shipped" the Products to CP Medical's end-user customers. (Burke Aff. ¶¶ 8-16; Exhibit 1, MPI Dep. at 254).

### 2. The Identity of Medical Products Distributors Are Not Secret.

While a customer list theoretically could be a trade secret in some circumstances, MPI presents no such circumstances here. *See generally, Oxford Global Resources, Inc. v. Guerriero*, 2003 WL 23112398, 8 (D.Mass.) (Woodlock, J.), noting distinctions as to circumstances where customer lists may be confidential, and citing *Hamburger v. Hamburger*, 4 Mass. L. Rptr. 409, 1995 WL 579679, *2 (Mass.Super.Ct.1995) ("customer lists are not considered trade secrets if the information is readily available from published sources, such as business directories"). *See also Home Paramount Pest Control Companies, Inc. v. FMC Corporation/Agricultural Products Group*, 107 F.Supp.2d 684, 692 (D. Md. 2000) (Where the "names and addresses of [distributor's] clients are obtainable through public sources such as a phone directory and trade

---

oral representations. Tyco Healthcare relies on the written terms of the Rebate Contract, Distributor Price List, Rebate Policy and other Terms of Sales and Distributor Policies that are provided to distributors, including MPI. (*See generally* McGrath Aff.)

associations," and "would be gathered as a matter of course as part of [distributor's] day-to-day operations," a listing of distributor's "top fifty customers" is not a trade secret.)

Even apart from MPI's affirmative obligation of disclosure discussed in the previous section of this memorandum, MPI has failed to demonstrate that the names of medical or veterinary distributors are trade secrets that carry any competitive advantage. In fact, the names of distributors that may purchase Tyco Healthcare products are public information and easily ascertainable. (*See* Exhibit 1, MPI Dep. at 73) (medical distributors can be found in public directories). Indeed, MPI admits that some or all of the distributors to which MPI sold the Products were Tyco Healthcare distributors in any event, and would ordinarily buy products directly from Tyco Healthcare. (Exhibit 1, MPI Dep. at 219-220).

MPI seeks to support its trade secret argument with inapposite cases standing for the unremarkable proposition that, in some circumstances, customer lists can be trade secrets. (Def. Mem. at 11). These cases, however, stand in sharp contrast to the facts in this case. Several of the cases cited by MPI involve explicit agreements <u>prohibiting</u> disclosure. *See e.g. Tom James Co. v. Hudgins*, 261 F.Supp.2d 636, 638-9 (S.D. Miss. 2003); *Union Nat. Life Ins. Co. v. Tillman*, 143 F.Supp.2d 638, 642 N.D. Miss. 2000). Here the agreement between the parties <u>requires</u> disclosure.

The remaining cases cited by MPI involve much more invasive discovery than that sought here, and even then the court in those cases required the party asserting a trade secret claim to produce the information pursuant to the kind of conditions reflected in the Confidentiality Order already in place in this matter. *See e.g. Star Scientific, Inc. v. Carter*, 204 F.R.D. 410, 419 (S.D. Ind. 2001) (Tobacco company plaintiff required to

8

produce information claimed to be trade secret under conditions of confidentiality and protective order);  *Duracell Inc. v. SW Consultants, Inc*., 126 F.R.D. 576, 578 (N.D. Ga. 1989) (plaintiff's broad discovery request seeking "marketing strategy, . . . sales (present and projected), customer lists, and other information about defendants' marketing approaches denied but request seeking confidential supplier lists allowed subject to confidentiality order).

        3.    **MPI's Claim That Disclosure "Might" Harm MPI Is Insufficient to Support Non-Disclosure.**

Finally, MPI alleges that disclosure of the identity of the distributors that received the Products "might" harm MPI. (Def. Mem. at 13). The "harm" that MPI alleges, however, is not a legitimate or reasonable harm that the trade secret privilege is intended to protect. Indeed, MPI's allegation of harm-- that MPI may no longer be able to divert lower-cost Products to other distributors if Tyco Healthcare sells directly to those distributors-- is merely another way of saying that MPI does not wish to reveal how its fraudulent scheme operates.

MPI claims that if it is required to comply with the Rebate Contract and its discovery obligations and disclose the identity of the distributors that purchased the Products from MPI, disclosure will give Tyco Healthcare "a significant competitive advantage. . .." (Def. Mem. at 14). This assertion is a variation on the theme that MPI is entitled to compete by unfair and deceptive means. MPI admits that none of the "customers" that it sold the Products to were end-user customers, but were instead other distributors.  (MPI Dep. at 218). The hypothetical harm suggested by MPI is a "harm" that might result from Tyco Healthcare offering distributor pricing to approved distributors, as it already does. MPI's method of "competing" with Tyco Healthcare's

9

distributor pricing by offering products at fraudulently reduced pricing is not the kind of harm that the trade secret privilege is intended to protect. [3]

MPI also cites a "risk of harm" to the distributors that purchased the Products from MPI if Tyco Healthcare learns of their identity. (Def. Mem. at 15). MPI bases this "risk of harm" on the erroneous premise that "the Plaintiff invariably will insist that each of those distributors produce their client lists and sales data." (*Id.*) Tyco Healthcare may or may not seek formal third-party discovery from the distributor purchasers, but cannot and need not make that decision until it knows who they are, and what evidence is readily available once that identity is known.[4] In addition, some of the distributors may voluntarily provide evidence, as CP Medical did when it confirmed that it purchased none of the Products from MPI. In any event, resolution of any dispute about potential discovery from third parties like the distributor purchasers can be reserved until an actual dispute exists. MPI's reliance on an attenuated risk of harm to the distributor purchasers cannot support its claim of trade secret privilege.

    **B.**    **The Identity Of The Distributors To Which MPI Diverted The Products Is Relevant and Will Lead To Other Relevant Evidence.**

Tyco Healthcare has set forth several reasons, among others, why the identity of the distributors to which MPI diverted the CP Medical Rebate Contract Products is relevant and will lead to evidence that will be admissible at trial. (*See* Tyco Healthcare Memorandum in Support of Motion to Compel, at 6-8). First, the evidence of where MPI sold the Products is relevant to the issue of MPI's false claims to have sold products

---

[3]    Furthermore, even if MPI's purported harm were entitled to judicial cognizance, the stipulated Confidentiality and Protective Order previously entered by the Court adequately serves this purpose.

[4]    For example, many of the distributors that purchased the Products are likely to be Tyco Healthcare distributors, enabling Tyco Healthcare to determine from its own records whether those distributors purchased products at into-stock prices.

to CP Medical and its intentional submission of false rebate claims. In response, MPI argues that "MPI has never disputed that it actually sold the Plaintiff's products to companies other than CP Medical." (Def. Mem. at 16). That is a welcome, but inaccurate, admission.

MPI was forced to admit that its claims to have sold the Products to CP Medical were false only after Tyco Healthcare had uncovered MPI's scheme and brought this action. Before that, MPI had always insisted that it sold the Products to, or as MPI later put it, "through," CP Medical. (Burke Aff. ¶¶ 8-16; Exhibit 1, MPI Dep. at 154; 176; 216-218; 251-252; 254; 257-269). Even after that false version became untenable, MPI falsely claimed that it "drop-shipped" the Products to CP Medical's customers. (*Id.*) When Mr. Burke requested invoices related to the alleged drop-shipments, MPI created and submitted false documents. (Exhibit 1, MPI Dep. at 257-269).

Given MPI's pattern of false statements and misleading explanations about its sale of the Products, Tyco Healthcare should not be forced to accept a stipulation that would prevent it from determining the truth about MPI's sales of the Products. MPI's belated offer to provide limited "information" about the distributors that received the Products (see Def. Mem. at 17) cannot substitute for evidence that may be obtained, and which Tyco Healthcare is entitled to seek, from those distributors. Neither Tyco Healthcare nor the Court should be compelled to depend upon the veracity of Eddie McCafferty and MPI in order to determine the facts in this case.

Second, evidence of MPI's transactions with other distributors, and evidence from those distributors concerning the fraudulent use of CP Medical Rebate Contract to give MPI unearned pricing advantages, will refute MPI's defense that it did not understand the

11

Rebate Contract and Tyco Healthcare's rebate policies. In response, MPI maintains that Tyco Healthcare need not worry about getting "'evidence about MPI's fraudulent diversion of products to customers and markets, such as veterinarians and veterinary markets'. . . [because] this information is addressed by MPI's offer to stipulate to other information about its clients, including what customers sold products to veterinary markets and how much product was sold that way." (Def. Mem. at 17).

Exactly how MPI proposes to "stipulate" as to "what customers sold products to veterinary markets and how much product was sold that way" is hard to imagine, particularly given Mr. McCafferty's vague deposition testimony when questioned about that issue. (*See* MPI Dep. at 65) ("I'm sure they do. I don't know for, you know, I'm sure they do [distribute to veterinary markets]"). In any case, MPI should not be permitted to claim ignorance about Tyco Healthcare distribution policies and rebate contracts, and at the same time bar Tyco Healthcare from inquiring with the specific distributors that, at a minimum, benefited from MPI's scheme about statements, terms, documents, and other evidence showing that MPI's diversion of needles and syringes at fraudulently reduced prices was not an innocent mistake.

Complete evidence of MPI's improper sale of the Products to other distributors also is relevant to issues of damages. That information will enable Tyco Healthcare to determine at what price, and for what markets, those specific distributors would have otherwise have purchased the Products from Tyco Healthcare, had not MPI diverted CP Medical Products to those distributors. In addition, whether damages are trebled under Chapter 93A depends on the willfulness of MPI's conduct, and discovery about and from

those who participated in MPI's diversion sales will provide evidence of that willfulness, as discussed above.

Finally, MPI contradicts its own assertion that evidence concerning MPI's sale of the Products to distributors is not relevant to damages. MPI argues that the amount of fraudulently earned rebates "has no relation to actual harm suffered by the Plaintiff, and would constitute a windfall <u>given that it would not have sold products for the pre-rebate amount</u>." (Def. Mem. at 18 and n. 4.) (emphasis added). While the amount of the rebates that MPI fraudulently obtained is a clear measure of damages, at least in part, evidence of whether the distributors that paid MPI for the diverted Products should have paid the distributor into-stock price, rather than a price discounted by fraud, would refute MPI's argument that Tyco Healthcare seeks any "windfall."

## IV.    CONCLUSION

Tyco Healthcare respectfully requests that the Court deny MPI's Motion for Protective Order, and order MPI to produce all responsive documents concerning sales of the Products, without redactions, and order that MPI refrain from continuing to conceal the identity of those entities to which it sold the Products.

Respectfully submitted,

TYCO HEALTHCARE GROUP LP

By its attorneys:

/s/ Jeffrey D. Clements
_____

Jeffrey D. Clements, BBO #632544
Ben T. Clements, BBO #555802
Clements & Clements LLP
50 Federal Street
Boston, MA 02110
(617) 451-1802

Dated: February 8, 2005

**CERTIFICATE OF SERVICE**

    I, Jeffrey D. Clements, hereby certify that a copy of the foregoing document was served electronically and by first class mail to counsel of record for the defendant on February 8, 2005.

/s/ Jeffrey D. Clements
_____