Deposition of Eddie McCafferty
January 5, 2005

Page 1

```
 1                                   VOLUME I
                                     PAGES: 1 - 293
 2                                   EXHIBITS: 1 - 12

 3              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 4
                         C.A. NO. 1:04-CV-11524-DPW
 5
     ****************************************
 6   TYCO HEALTHCARE GROUP, LP,              *
         Plaintiff,                          *
 7                                           *
         vs.                                 *
 8                                           *
     MEDICAL PRODUCTS, INC.,                 *
 9       Defendant.                          *
     ****************************************
10

11

12       DEPOSITION OF EDDIE MCCAFFERTY, a witness

13   called on behalf of the Plaintiff, taken pursuant

14   to the applicable provisions of the Federal Rules

15   of Civil Procedure, before Jacqueline Curran,

16   Registered Merit Reporter and Notary Public in and

17   for the Commonwealth of Massachusetts, at the law

18   offices of Clements & Clements, LLP, 50 Federal

19   Street, Boston, Massachusetts, on Wednesday,

20   January 5, 2005, commencing at 10:10 a.m.

21

22              CURRAN COURT REPORTING
                  21 Rowe Hill Road
23           Stoneham, Massachusetts 02180
                   (781) 279-8400

24
```

Page 2

```
 1              A P P E A R A N C E S

 2   REPRESENTING THE DEFENDANT:

 3       DWYER & COLLORA, LLP
         By:  Michael B. Galvin, Esq.
 4            Jessica P. Driscoll, Esq.
         600 Atlantic Avenue
 5       Boston, MA 02210-2211
         (617) 371-1000
 6

 7
     REPRESENTING THE PLAINTIFF:
 8
         CLEMENTS & CLEMENTS, LLP
 9       By:  Jeffrey D. Clements, Esq.
         50 Federal Street
10       Boston, MA 02110
         (617) 451-1800
11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Deposition of Eddie McCafferty
January 5, 2005

Page 65

```
 1      Q.   Do any of your customers distribute to
 2   veterinarian markets?
 3      A.   I'm sure they do.  I don't know for, you
 4   know, I'm sure they do.
 5      Q.   Why do you think that?
 6      A.   Well, we -- I mean, the broad base that
 7   we sell to we feel like we sell to distributors
 8   that sell to dental, veterinarian, medical, home
 9   health, DMEs.
10      Q.   Are there distributors that focus on the
11   veterinarian market as opposed to the human health
12   market?
13      A.   There is.
14      Q.   And who are the ones that you're
15   familiar with who do that?
16           MR. GALVIN:  Are you asking for
17      distributors in general who focus on
18      veterinarian groups?
19      Q.   Yes.  And that you're familiar with, Mr.
20   McCafferty, from your business that you've done
21   business with them.
22      A.   Oh, that I've done business with?
23      Q.   Let me break it up.  You're familiar
24   with some distributors concentrate on the
```

Deposition of Eddie McCafferty
January 5, 2005

Page 73

```
 1   at MPI?
 2        A.   For?
 3        Q.   Confidentiality policies for your
 4   employees.
 5        A.   Oh, yes, we do.
 6        Q.   Are those written?
 7        A.   They're written and signed, yes.
 8        Q.   Meaning they're signed by each employee?
 9        A.   Yes, and two witnesses.
10        Q.   Do you maintain those --
11        A.   Yes.
12        Q.   -- in a file?
13        A.   We do.
14        Q.   Do you take any other steps to keep the
15   information about your customers confidential?
16        A.   No.
17        Q.   Are there directories of medical
18   distributors?
19        A.   I'm sorry?
20        Q.   Are there directories --
21        A.   Yes.
22        Q.   -- in the trade for medical
23   distributors?
24        A.   Yes.
```

Deposition of Eddie McCafferty
January 5, 2005

Page 123

1  contract?  Okay?
2      A.   Yes.
3      Q.   So as I understood your testimony, the
4  2001 contract came about as a result of Rob Cotten
5  coming to visit you, is that right?
6      A.   Yes.
7      Q.   Other than Rob Cotten, did you, Eddie
8  McCafferty, speak to anybody at Kendall before the
9  2001 contract was put in place?
10     A.   I don't recall that I did.
11     Q.   Do you know of anyone at Kendall or Tyco
12 Healthcare who was involved in that contract other
13 than -- meaning the 2001 contract -- other than
14 Rob Cotten?
15     A.   Not -- I mean, personally, I don't, no.
16 No, I don't.
17     Q.   Sometime in 2001 you resumed purchasing
18 products directly from Kendall, Tyco Healthcare?
19     A.   Yes, sir.
20          MR. CLEMENTS:  I want to turn
21   for a moment, Mr. McCafferty, to some
22   documents and ask you about that that MPI
23   produced in this litigation.
24          (Deposition Exhibit No. 3, PO History

Page 154

1  did take place, it would be, like I said,
2  incidental.  I mean, it would not be anything I
3  would remember like, you know, call up and do you
4  have some gauze that we need or something, you
5  know, it would be something just probably filling
6  an order for maybe one item left or something, you
7  know, but not really anything.
8       Q.   So you can't recall any sales MPI
9  made --
10      A.   No.
11      Q.   -- to CP Medical in the, say the past
12 six to eight years?
13      A.   Probably not, no.
14      Q.   Other than Pat Ferguson, who else do you
15 know at CP Medical?
16      A.   I know Jeff only on the phone.
17      Q.   Who's Jeff?
18      A.   He's --
19      Q.   What's his last name?
20      A.   Burrow or something like that.  I'm not
21 really --
22      Q.   Barron?
23      A.   Barron, there you go.
24      Q.   Do you know what Jeff Barron does at CP

Deposition of Eddie McCafferty
January 5, 2005

Page 176

```
 1      Q.   CP Medical wasn't actually your customer
 2   for MPI, correct?
 3      A.   No, they were.
 4      Q.   Did you sell any Kendall products to CP
 5   Medical?
 6      A.   No.  No, I didn't, but I couldn't.
 7      Q.   Well, did you?
 8      A.   No.
 9      Q.   And you understood when you called CP
10   Medical that you were setting up CP Medical simply
11   on the contract regardless of whether you'd sell
12   products to them or not, did you not?
13      A.   Yes.  Yes.
14      Q.   And you didn't care whether CP Medical
15   actually bought the products or whether you sold
16   them to somebody else, right?
17      A.   Exactly.
18      Q.   And I asked you if that was a common
19   practice and you said yes, correct?
20      A.   Well, let me say this, it's common to
21   call an account like a company and ask them if you
22   can put them on a contract.  I may have
23   misunderstood you on that.
24      Q.   So it's common for you to call a
```

Deposition of Eddie McCafferty
January 5, 2005

Page 185

```
 1      Q.   And you've had contracts where you've
 2  had customer buckets where you put sales into,
 3  right?
 4      A.   You know, I'd have to -- I don't know
 5  when, I mean, I'd have to look back and see.
 6      Q.   Before 1999?
 7      A.   I don't know.  I'd have to look back and
 8  see.  I'm not sure.
 9      Q.   Where would you look back to see?
10      A.   I would just have to see if there was
11  any files available that I could pull to see how
12  the contracts were written, you know, or done
13  'cause contracts can change from one time to
14  another, you know.
15      Q.   So it's your testimony sitting here
16  today that you do not know whether you used
17  buckets to put sales into in other contracts
18  before 1999?
19      A.   That's right.
20      Q.   You don't know that?
21      A.   I don't know.
22      (Deposition Exhibit No. 5, Kendall
23      Healthcare Company Rebate Contract
24      Notification, marked for identification)
```

Deposition of Eddie McCafferty
January 5, 2005

Page 186

```
 1      Q.   I'm going to show you Exhibit 5, Mr.
 2   McCafferty.  Let me know when you've had a chance
 3   to look at that.
 4      A.   Okay.
 5      Q.   You've looked at Exhibit 5?
 6      A.   Yes.
 7      Q.   That's your handwriting on the first
 8   page?
 9      A.   Yes.
10      Q.   Could you read what it says?
11      A.   Kendall contracts Fort Smith, CP Medical
12   or CP rather, I'm sorry.
13      Q.   And you got these documents from the MPI
14   files, is that right?
15      A.   No.  This came from Kendall.
16      Q.   No.  I'm asking -- I'll represent to you
17   that your company produced this document in this
18   litigation.
19      A.   Oh, yeah.
20      Q.   I'm asking you where you got it?
21      A.   Yeah.  We have a file, I'm sure, a
22   Kendall file that this was in.
23      Q.   And where was that file maintained?
24      A.   In purchasing, just in a file cabinet.
```

Deposition of Eddie McCafferty
January 5, 2005

Page 189

```
 1      A.   It's our cost, yeah.
 2      Q.   That's your contracts, isn't it?
 3      A.   I'm sorry?
 4      Q.   It's your contracts with Kendall, isn't
 5   it?
 6      A.   Well, yeah, but I mean, it's -- I mean,
 7   it's a cost is what we --
 8      Q.   Let me direct your attention back to the
 9   first page of Exhibit 5.  You wrote Kendall
10   contracts, didn't you?
11      A.   Uh-huh, I did.
12      Q.   And one of the or some of the contracts
13   concern Fort Smith, the other concerns CP Medical,
14   correct?
15      A.   Yes.
16      Q.   And now, is it true that Exhibit 5
17   contains the Kendall contracts with respect to CP
18   Medical and Fort Smith?
19      A.   Yes.
20      Q.   Would you turn to MPI 0150, the first
21   page?
22      A.   Okay.
23      Q.   What's the title of the document?
24      A.   Kendall Healthcare Company Rebate
```

Page 216

1    A.    Indirect.

2    Q.    Do you know what that means?

3    A.    No.

4    Q.    Do you recall when the CP Medical

5    contract terminated?

6           MR. GALVIN:  Which year?

7           MR. CLEMENTS:  Well, the CP

8    Medical contract that went through 2003.

9    A.    I think it was July of '03.

10   Q.    Your counsel is raising a good point, I

11   want to clarify when we're talking about the CP

12   Medical contract, we're including the extensions

13   that carried it through '03 that you testified

14   about, okay?  Do you understand that?

15   A.    Yes.

16   Q.    So the CP Medical contract when it was

17   finally terminated, your recollection was July of

18   2003?

19   A.    Yes.

20   Q.    Now, throughout that time the CP Medical

21   contract was in effect, MPI purchased products

22   under that contract from Kendall, correct?

23   A.    Yes.

24   Q.    The products involved Monoject needles

Deposition of Eddie McCafferty
January 5, 2005

Page 217

```
 1    and syringes, is that right?
 2         A.   That's right.
 3         Q.   Were there other products besides that?
 4         A.   No.  No.
 5         Q.   All needles and syringes?
 6         A.   Yes.
 7         Q.   When MPI purchased those products under
 8    the CP Medical contract, MPI submitted rebate
 9    claims to Kendall under the contract, correct?
10         A.   Yes.
11         Q.   And on the rebate claims, CP Medical was
12    identified as the end customer, correct?
13         A.   Yes.
14         Q.   Of the products purchased under the CP
15    Medical contract, was a single product actually
16    sold by MPI to CP Medical?
17         A.   No.
18         Q.   Not one?
19         A.   No.
20         Q.   Was a single product purchased under the
21    CP Medical contract by MPI sold to any CP Medical
22    end user customer?
23         A.   No.
24         Q.   Not one?
```

Page 218

 1    A.    Not one.

 2    Q.    No products you purchased under the CP
 3  Medical contract were drop shipped by MPI to CP
 4  Medical customers, were they?

 5    A.    No.

 6    Q.    They were all sold to MPI distributor
 7  customers?

 8    A.    Yes.

 9    Q.    Did you ever tell anyone at Kendall that
10  you were selling the CP Medical contract products
11  to distributor customers of MPI?

12    A.    Rob Cotten knew.

13    Q.    Did you tell Rob Cotten that?

14    A.    He was the one that suggested it.

15    Q.    Did you tell Rob Cotten that?

16    A.    Yes.  Yes.

17    Q.    When did you tell Rob Cotten that?

18    A.    The day he was going to do the contract.

19    Q.    And what did you tell him?

20    A.    He said he wanted, again, to set up two,
21  you know, accounts to put the sales in, and I told
22  Rob, I said, I'm not going to sell to just two
23  people if that's what you're implying if we can't
24  sell to our customer base, he said, no, you don't

Page 219

1  understand, you can sell to your whole customer
2  base, this is like a blanket contract that we're
3  going to put some sales into this one and some
4  sales into that one, so I made it perfectly clear
5  up front.
6      Q.   Did you tell Rob Cotten that your
7  customers were distributors?
8      A.   Yes.  He knew that, David Gaffney knew
9  that.
10     Q.   Why do you think they knew that?
11     A.   Well, that's what we do.  I mean, that's
12 what we've always done that we sell to
13 distributors.  I mean, I made no bones about it.
14 I mean, they knew that.
15     Q.   Did you ever tell David Gaffney that you
16 sell to distributors?
17     A.   He told me the first visit.
18     Q.   How did he know that?
19     A.   I don't know.  He just walked in and he
20 said you're selling to a lot of our customers
21 which are distributors and we'd like to get some
22 sales leads, you know, we'd like to -- we'd like
23 to set you up direct so we could get sales credit.
24     Q.   So David Gaffney told you you were

Page 220

1   selling to Tyco Healthcare and Kendall customers?
2       A.   Yes.
3       Q.   And the distributors you were selling to
4   were Kendall customers?
5       A.   Yeah.  Basically he just said you're
6   selling -- his words were you're selling a lot of
7   product -- a lot of Kendall product to our
8   customers, we'd like to set you up direct so we
9   can get sales credit, so they both knew.
10      Q.   Rob Cotten wasn't at the first
11  meeting --
12      A.   No.
13      Q.   -- that David Gaffney was at, was he?
14      A.   No.
15      Q.   When did you tell Rob Cotten that you
16  were selling to distributors who were Tyco
17  Healthcare customers?
18      A.   I didn't tell Rob that.  I just told Rob
19  that we were -- David's the one that said that.  I
20  didn't -- I never said that statement at all.
21      Q.   What did you tell Rob Cotten about your
22  customers?
23      A.   I told him that we sell to the small to
24  medium distributors.